Valeria **TANCO** and Sophie Jesty, Ijpe DeKoe and Thomas Kostura, and Johno Espejo and Matthew Mansell, Plaintiffs,

v.

William Edward "Bill" **HASLAM,** as Governor of the State of Tennessee, in his official capacity; Larry Martin, as Commissioner of the Department of Finance and Administration, in his official capacity, and Robert Cooper, as Attorney General & Reporter of the State of Tennessee, in his official capacity, Defendants.

Case No. 3:13–cv–01159.

United States District Court, M.D. Tennessee, Nashville Division.

Filed March 14, 2014.

Abby Rose Rubenfeld, Rubenfeld Law Office, PC, John L. Farringer, IV, Phillip F. Cramer, Scott Hickman, William L. Harbison, Sherrard & Roe, Nashville, TN, ASAF ORR, Christopher F. Stoll, Shannon P. Minter, San Francisco, CA, Maureen T. Holland, Holland & Associates, PLLC, Memphis, TN, Regina M. Lambert, Law Office of Regina M. Lambert, Knoxville, TN, for Plaintiffs.

Martha A. Campbell, Kevin Gene Steiling, Tennessee Attorney General's Office, Nashville, TN, for Defendants.

### MEMORANDUM

ALETA A. TRAUGER, District Judge.

Before the court is the plaintiffs' Motion for Preliminary Injunction (Docket No. 29), to which the defendants filed a Response in opposition (Docket No. 35) and the Family Action Council of Tennessee ("FACT") filed an *amicus brief* in opposition (Docket No. 43), and the plaintiffs filed a Reply (Docket No. 46) and several Notices of Filing of Supplementary Authority (Docket Nos. 48, 55, 56, and 58). For the reasons stated herein, the motion will be granted.

### OVERVIEW

The plaintiffs are three married, same-sex couples who lived and were legally married in other states before moving to Tennessee.[1] Tennessee does not recognize their marriages for one reason only: they do not reflect a union between "one man and one woman." *See* Tenn. Const. Art. XI, § 18; Tenn.Code Ann. § 36–3–113 (collectively, the "Anti–Recognition Laws").[2] The plaintiffs challenge the constitutionality of the Anti–Recognition Laws.[3] Pending a final decision on the merits of their claims, the plaintiffs seek a preliminary injunction that would prevent the defendants from enforcing the Anti–Recognition Laws against them.

At the outset, given the sensitivity of the issues presented, the court emphasizes the narrowness of the decision it is issuing today.

First, the nature of a preliminary injunction remedy is just that—preliminary. It is not a final judgment on the merits of a case. Instead, it *preliminarily* enjoins a party (here, effectively, the State of Tennessee) from engaging in a particular action until the court can rule on the merits of the plaintiffs' claims at a later stage, typically with the benefit of more evidence and legal authority. In making its decision, the court must decide, among other things, whether the plaintiffs are *likely* to prevail on the merits of their claims, not that they have prevailed or that they necessarily will prevail on their claims. In

---

1. This lawsuit was originally filed by four same-sex couples. On March 10, 2014, the parties stipulated to the dismissal of one of the couples (Kellie Miller and Vanessa DeVillez) and defendant Bill Gibbons, Commissioner of the Department of Safety and Homeland Security. (Docket No. 59.) The remaining plaintiffs are Valeria Tanco and Sophie Jesty, Ijpe DeKoe and Thomas Kostura, and Johno Espejo and Matthew Mansell. The remaining defendants are Governor Bill Haslam, Commissioner of the Department of Finance and Administration Larry Martin, and Attorney General Robert Cooper.

2. Tenn.Code Ann. § 36–3–113 provides that, among other things, "[i]f another state or foreign jurisdiction issues a license for persons to marry, which marriages are prohibited in this state, any such marriage shall be void and unenforceable in this state." *Id.* at

113(d). The statute further provides that "it is [ ] the public policy of this state that the historical institution and legal contract solemnizing the relationship of (1) man and one (1) woman shall be the only legally recognized marital contract in this state in order to provide the unique and exclusive rights and privileges to marriage." *Id.* at § 113(a). The Tennessee Constitution, which was amended in 2006 to incorporate the so-called "Tennessee Marriage Protection Amendment" following a popular referendum, contains essentially the same provisions.

3. To the extent that the court references laws in other states that similarly discriminate against same-sex marriages consummated in another state that recognizes same-sex marriage, the court will refer to those laws without capitalization as "anti-recognition laws" for ease of reference.

other words, the court's decision today simply reflects its best projection, based on the evidence and the existing state of the law, as to whether the plaintiffs are *likely* to win their case. Currently, all relevant federal authority indicates that the plaintiffs in this case are indeed likely to prevail on their claims that the Anti–Recognition Laws are unconstitutional. That said, by the time that this court is asked to render a final judgment, it may be that other federal courts will have reached a different interpretation that favors the defendants' position. By the same token, it may be that federal courts will continue uniformly to strike down anti-recognition laws, state same-sex marriage bans, and other laws that discriminate based on sexual orientation. The impact of future decisions, which are forthcoming as the result of continuing litigation in other federal trial and appellate courts across the country, will inevitably influence the ultimate disposition of this case.

Second, the plaintiffs have *not* directly challenged Tennessee's refusal to permit same-sex marriages from being consummated in Tennessee. Instead, the plaintiffs challenge only Tennessee's refusal to recognize marriages legally consummated by same-sex couples in other states, such as a same-sex couple that weds in New York (a state that permits same-sex marriage) before moving to Tennessee.

Third, even with respect to the Anti–Recognition Laws, the plaintiffs seek temporary relief *only as to the six specific plaintiffs (three couples) remaining in this lawsuit.* They do not seek class relief in their Complaint or in their request for a preliminary injunction.

As explained in this opinion, the plaintiffs have persuaded the court to enjoin enforcement of the Anti–Recognition Laws against them, pending a final decision on the merits. The court's order only means that, at least for the time being, Tennessee will not be able to enforce the Anti–Recognition Laws against six people (three same-sex couples) until the court renders a final judgment in the case. Thus, even after today, Tennessee's ban on the consummation of same-sex marriages within Tennessee remains in place, and Tennessee may continue to refuse to recognize same-sex marriages consummated in other states, *except* as to the six plaintiffs in this case. The court's opinion should not be construed in any other way.[4]

### THE PLAINTIFFS

The plaintiffs in this case have filed unrebutted affidavits that describe their personal backgrounds, how they met their

---

4. In *De Leon v. Perry*, 975 F.Supp.2d 632, 2014 WL 715741 (W.D.Tex. Feb. 26, 2014), the parties disputed whether the district's injunction against enforcement of a similar Texas anti-recognition law applied only to the plaintiffs in that case, as opposed to all similarly situated plaintiffs statewide. In a footnote, the court found that its preliminary injunction would apply statewide. *Id.* at 665 n. 7, 2014 WL 715741 at \*27 n. 7. Here, the plaintiffs have not argued that their injunction should or would apply statewide; to the contrary, they have argued that the narrowness of the requested injunction justifies its issuance (*see* Docket No. 30 at p. 39 ("Any administrative burden on the State from recognizing

Plaintiffs' four additional valid marriages would be negligible.")), and their request for relief is limited to the plaintiffs in this case (*see id.* at p. 40 ("Plaintiffs respectfully request that the Court issue a preliminary injunction barring Defendants and those under their supervision from enforcing the Anti–Recognition Laws *against the four plaintiff couples in this case* while this action is pending.") (emphasis added)). Because the plaintiffs have limited their request for preliminary injunctive relief in this fashion, the court expresses no opinion concerning the potential application of its ruling statewide, if these or any other potential plaintiffs were to request broader relief in the future.

respective spouses, when and why they moved to Tennessee, and the harm that they have suffered, or may suffer, from Tennessee's enforcement of the Anti–Recognition Laws. The court will summarize the circumstances of each couple briefly.

## I. *Dr. Valeria Tanco and Dr. Sophia Jesty*

Valeria Tanco and Sophia Jesty are both professors at the University of Tennessee College of Veterinary Medicine. They met in 2009 at the College of Veterinary Medicine at Cornell University in Ithaca, New York, fell in love in 2010, and legally married each other in New York on September 9, 2011. After spending a year living apart, they sought to find work as professors in the same geographic area. When the University of Tennessee's College of Veterinary Medicine offered positions to both of them, they accepted the offers and began residing together in Knoxville, Tennessee.

In addition to certain alleged injuries common to all plaintiffs, Dr. Tanco and Dr. Jesty have several special concerns. First, they purchased a house together, but, because Tennessee law may treat them as strangers rather than as a married couple, they are not assured of the same property protections in their home as a heterosexual married couple. Second, the University of Tennessee health insurance system will not permit them to combine their respective individual health insurance plans into a family plan, because UT's insurance plan incorporates the Anti–Recognition Laws. Third, in the summer of 2013, Dr. Tanco became pregnant through artificial insemination, and her due date is March 21, 2014.[5] Under the existing state of the law in Tennessee, upon the birth of their child,

Dr. Jesty will not be recognized as the child's parent, and many of the legal rights that would otherwise attach to the birth of a child (artificially inseminated or otherwise) will not apply to Dr. Jesty or to the child. These include the child's right to Social Security benefits as a surviving child if Dr. Jesty should die, the right for Dr. Jesty to visit her child at a hospital if Dr. Tanco is unable to give consent to her presence at the time the baby is born, and the right of Dr. Jesty to make medical decisions regarding the medical care provided to their baby in the event that Dr. Tanco is unable to make those decisions. Fourth, and finally, they are concerned about the environment in which their child will be raised, fearing that Tennessee's refusal to recognize her parents' marriage will stigmatize her, cause her to believe that she and her family are entitled to less dignity than her peers and their families, and give her the impression that her parents' love and their family unit is somehow less stable.

## II. *Sergeant Ijpe DeKoe & Mr. Thomas Kostura*

Ijpe DeKoe is a Sergeant First Class in the United States Army Reserves. He resides and is stationed in Memphis, Tennessee. Thomas Kostura is a graduate student at the Memphis College of Fine Arts. In March 2011, Sgt. DeKoe began dating Mr. Kostura, who was a New York resident at the time. They fell in love that year. At some point before August 2011, Sgt. DeKoe was transferred to Fort Dix in New Jersey in preparation for deployment to Afghanistan. On August 4, 2011, before Sgt. DeKoe was deployed, he and Mr. Kostura legally married in New York. In May 2012, after Sgt. DeKoe returned from

---

5. In support of the plaintiffs' Motion to Ascertain Status (Docket No. 61), the plaintiffs filed a supplemental Declaration of Valeria Tanco (Docket No. 62), which, among other things, stated Dr. Tanco's due date.

his deployment to Afghanistan, he and Mr. Kostura moved to Memphis, where was DeKoe was again stationed.

On September 3, 2013, the United States Department of Defense began recognizing Sgt. DeKoe and Mr. Kostura's marriage. Although the military recognizes Sgt. De-Koe's marriage to Mr. Kostura, Tennessee does not. Sgt. DeKoe avers that, "[a]s someone who has dedicated my career and risked my life to protect American values of freedom, liberty, and equality, it is particularly painful to return home after serving in Afghanistan only to have my citizenship diminished by Tennessee's refusal to recognize our marriage."

### III. *Johno Espejo & Matthew Mansell*

Johno Espejo met Matthew Mansell in approximately 1995 in San Francisco, California. They began dating and have been in a committed relationship since that time. While living in Alameda, California, they decided to start a family together by adopting children from the Alameda foster care system. In December 2007, the foster agency placed a thirteen-month old boy in their home. Approximately five months later, in 2008, the agency placed a newborn girl in their home. On August 5, 2008, Mr. Espejo and Mr. Mansell legally married each other in California. On September 25, 2009, Mr. Espejo and Mr. Mansell legally adopted the two foster children. Mr. Espejo gave up his job as a forklift driver to be a stay-at-home parent for their children.

Approximately four years ago, Mr. Mansell began working at a large international law firm in San Francisco, California, conducting conflict-of-interest checks. In 2012, the law firm announced that it would be centralizing and relocating its administrative services, including Mr. Mansell's department, to a new office located in Nashville, Tennessee. In May 2012, Mr.

Espejo and Mr. Mansell moved to Franklin, Tennessee, so that Mansell could continue working for the law firm. Mr. Espejo took a part-time job at his local YMCA, which allowed him to balance his duties as a stay-at-home parent with his job.

Similar to the fears that Dr. Tanco and Dr. Jesty harbor for the child they are expecting, Mr. Espejo and Mr. Mansell are concerned about the impact of Tennessee's Anti–Recognition laws on their children.

### IV. *Common Statements*

The plaintiffs' declarations contain statements about their experiences, hopes, and fears. Each couple married for several reasons, including their commitment to love and support one another, to demonstrate their mutual commitment to their family, friends, and colleagues, and to show others that they should be treated as a family. They also married to make a legally binding mutual commitment, to join their resources together in a legal unit, and to be treated by others as a legal family unit, rather than as legally unrelated individuals. Finally, each couple married so that they could access the legal responsibilities of marriage to protect themselves and their families, just as heterosexual couples do.

The plaintiffs agree that they have been warmly welcomed by many Tennesseans, including their neighbors and colleagues. However, each couple is aware that Tennessee does not afford them the same rights as opposite-sex married couples and that the state government does not treat their relationship with the same dignity and respect as opposite-sex married couples. Because Tennessee law does not extend them certain rights of marriage, including certain protections in times of crisis, emergency, or death, they are denied the security and peace of mind that those protections provide to other families.

Although they acknowledge that they can take additional steps to reduce some of these uncertainties—such as executing powers of attorney, wills, and other probate documents—they aver that these steps would be costly and time-consuming, that opposite-sex married couples would not need to take these measures, and that they would result in only minimal legal protections relative to the full panoply of rights that otherwise attach to state-sanctioned marriage.

The couples have also described how Tennessee's refusal to recognize their marriages causes them dignitary and reputational harm. When they interact with Tennessee officials or fill out official forms to identify themselves as married, they brace themselves for degrading experiences that often occur because of Tennessee's refusal to recognize their marriages. They regard these experiences as insulting to their personal dignity, insulting to their family's dignity, and demeaning to their relationships.

The plaintiffs also state that, by treating their marriages as if they did not exist, the state of Tennessee encourages private citizens to deny their marriages and exposes them to discrimination in their daily lives.

Finally, the plaintiffs aver as follows:

Every day that Tennessee refuses to respect our marriage is a day that our family must suffer the indignity, stress, and stigma of not knowing whether or when our marriage will be recognized. Unlike opposite-sex couples who have the security of knowing that their marriage will be universally respected by the state and by private actors, Tennessee's constitutional and statutory denial of recognition to our marriage means that whatever recognition our marriage may receive is only by the forbearance and good graces of private actors.

## V. *This Lawsuit and the Preliminary Injunction Motion*

On October 23, 2013, the plaintiffs filed this lawsuit, which challenges the constitutionality of the Anti–Recognition Laws.

On November 29, 2013, the plaintiffs moved to enjoin enforcement of the Anti–Recognition Laws against them, arguing that the Anti–Recognition Laws violate their rights under the United States Constitution to due process, interstate travel, and equal protection.[6] The government opposes the motion, contending that the claims are untimely, that the plaintiffs are not likely to succeed on the merits of their claims, that the plaintiffs will suffer no irreparable harm in the absence of a preliminary injunction, that the balance of harms favors the government, and that the public interest would be best served by denying the motion.[7]

### *PRELIMINARY INJUNCTION STANDARD*

▮ Under Fed.R.Civ.P. 65, the court may issue a preliminary injunction under appropriate circumstances. In assessing whether an injunction is appropriate, the court applies the following standard:

A plaintiff seeking a preliminary injunction must establish that he is likely to

---

**6.** In support of their motion, the plaintiffs filed a Memorandum of Law (Docket No. 30), an Appendix of cases (Docket No. 31), and a Notice containing separate declarations from each plaintiff (Docket No. 32).

**7.** In support of their brief in opposition, the defendants filed an Appendix of legal authority (Docket No. 36) and a Notice containing the Declaration of Mark Goins, State Coordinator of Elections (Docket No. 37, Attachment No. 1), and the Affidavit of Connie Walden (*id.*, Attachment No. 2). FACT filed an *amicus* brief in support of the defendants' position. (Docket No. 43.)

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.

*Obama for Am. v. Husted,* 697 F.3d 423, 428 (6th Cir.2012) (citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). "These four considerations are 'factors to be balanced and not prerequisites that must be satisfied.'" *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.,* 716 F.3d 952 (6th Cir.2013) (citing *Am. Imaging Servs., Inc. v. Eagle–Picher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir.1992)); *Performance Unlimited v. Questar Pubs., Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995).

### *ANALYSIS*

### I. *Likelihood of Success on the Merits*

#### A. Statute of Limitations

■ The parties agree that Tennessee's one-year statute of limitations governs the plaintiffs' claims. *See* Tenn.Code Ann. § 28–3–104(a)(3); *Hughes v. Vanderbilt Univ.,* 215 F.3d 543, 547 (6th Cir.2000). The defendants argue that the one-year statute of limitations bars the plaintiffs' claims.

■ The "continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations." *Kuhnle Bros., Inc. v. Cnty. of Geauga,* 103 F.3d 516, 522 (6th Cir.1997). "A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within" the applicable state statute of limitations. *Id.* Where, as here, a law impinges each day on a plaintiff's constitutional rights, a new limitations period begins to run "each day as to that day's damage." *Id.* Here, the plain-

tiffs have each alleged various ongoing harms resulting from Tennessee's refusal to recognize their marriages, including dignitary harms and reputational harms, as well as daily concerns related to parentage, medical care, insurance, property ownership, and the like. These injuries occurred within a year of filing suit and, for the reasons explained in the next section, likely reflect ongoing deprivations of their constitutional rights. Therefore, the court finds that the statute of limitations does not bar the plaintiffs' claims.

#### B. Alleged Deprivation of Constitutional Rights

■ The parties vigorously dispute whether Tennessee's Anti–Recognition Laws violate the plaintiffs' constitutional rights. The plaintiffs, the defendants, and FACT (as *amicus curiae*) have thoroughly and cogently briefed their respective positions concerning the complex, sensitive, and important legal issues presented by this case.

In *United States v. Windsor,* —— U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), the Supreme Court struck down a provision of the federal Defense of Marriage Act and held that the federal government cannot refuse to recognize valid marriages in states that recognize same-sex marriage. Since the Supreme Court issued *Windsor,* numerous federal courts, including courts within the Sixth Circuit, have addressed the impact of *Windsor* on state laws relating to same-sex couples and sexual orientation. These courts have uniformly rejected a narrow reading of *Windsor*—such as that advanced by the defendants here—and have found that *Windsor* protects the rights of same-sex couples in various contexts, notwithstanding earlier Supreme Court and circuit court precedent that arguably suggested

otherwise.[8] These cases include decisions both inside and outside of this circuit, finding that similar state anti-recognition laws are or likely are unconstitutional (*Bourke, Obergefell I* and *II*, and *De Leon*), decisions granting a preliminary injunction under similar circumstances (*De Leon, Bostic*), and decisions finding that same-sex marriage bans are unconstitutional in the first place (*De Leon, Kitchen, Bostic,* and *Lee* ).[9] In these thorough and well-reasoned cases, courts have found that same-sex marriage bans and/or anti-recognition laws are unconstitutional because they violate the Equal Protection Clause and/or the Due Process Clause, even under "rational basis" review, which is the least demanding form of constitutional review.

In light of this rising tide of persuasive post-*Windsor* federal caselaw, it is no leap to conclude that the plaintiffs here are likely to succeed in their challenge to Tennessee's Anti–Recognition Laws. With respect to the plaintiffs' Equal Protection Clause challenge, the defendants offer arguments that other federal courts have already considered and have consistently rejected, such as the argument that notions of federalism permit Tennessee to discriminate against same-sex marriages consummated in other states, that *Windsor* does not bind the states the same way that it binds the federal government, and that Anti–Recognition Laws have a rational basis because they further a state's interest in procreation, which is essentially the only "rational basis" advanced by the defendants here.[10]

---

**8.** *See generally Obergefell v. Kasich,* 2013 WL 3814262 (S.D.Ohio July 22, 2013) (*"Obergefell I"*) (preliminarily enjoining enforcement of Ohio anti-recognition law); *Kitchen v. Herbert,* 961 F.Supp.2d 1181 (D.Utah 2013) (Utah ban on same-sex marriage unconstitutional); *Obergefell v. Wymyslo,* 962 F.Supp.2d 968 (S.D.Ohio 2013) (*"Obergefell II"*) (Ohio anti-recognition law unconstitutional); *Bishop v. United States,* 962 F.Supp.2d 1252 (N.D.Okla. 2014) (Oklahoma ban on same-sex marriage unconstitutional); *Bourke v. Beshear,* 996 F.Supp.2d 542, 2014 WL 556729 (W.D.Ky. Feb. 12, 2014) (finding that Kentucky anti-recognition law was unconstitutional); *Bostic v. Rainey,* 970 F.Supp.2d 456 (E.D.Va.2014) (Virginia ban on same-sex marriage unconstitutional); *Lee v. Orr,* 2014 WL 683680 (N.D.Ill. Feb. 21, 2014) (Illinois ban on same-sex marriage unconstitutional as applied to a particular county); *De Leon,* 975 F.Supp.2d 632, 2014 WL 715741 (issuing preliminary injunction barring Texas from enforcing prohibition on recognition of out-of-state same-sex marriages).

**9.** Notably, Oregon, Virginia, and Nevada have also declined to defend or have abandoned their defense of same-sex marriage bans in those states, on the basis that the laws are unconstitutional. *See, e.g. Geiger et al. v. Kitzhaber, et al.,* Case No. 6:13–cv–018340–MC (D.Or.), *Geiger* Docket No. 47 at ¶ 28 ("State

Defendants will not defend the Oregon ban on same-sex marriage in this litigation. Rather, they will take the position in their summary judgment briefing that the ban cannot withstand a federal constitutional challenge under any standard of review."); *Bostic,* 970 F.Supp.2d at 461, 2014 WL 561978, at *2 ("On January 23, 2014, Defendant Rainey, in conjunction with the Office of the Attorney General, submitted a formal change in position, and relinquished her prior defense of Virginia's Marriage Laws."); *Sevcik et al. v. Sandoval et al.,* No. 12–17668 (9th Cir.) (pending appeal), *Sevcik* Appellate Docket No. 171 (defendants withdrawing their brief in support of appeal, because intervening caselaw indicated that "discrimination against same-sex couples is unconstitutional"). In a recent case, the Ninth Circuit also found that classifications based on sexual orientation require heightened scrutiny. *See SmithKline Beecham Corp. v. Abbott Labs.,* 740 F.3d 471, 483–84 (9th Cir.2014). Numerous state courts have also found that state bans on same-sex marriage are or likely are unconstitutional. *See, e.g., Garden State Equality v. Dow,* 216 N.J. 314, 79 A.3d 1036 (2013) (in light of *Windsor,* refusing to stay trial court order requiring New Jersey officials to administer marriage laws equally for same-sex couples).

**10.** (*See* Docket No. 35, Defs. Mem., at pp. 14–17.)

In particular, at this stage, the court finds Judge Heyburn's equal protection analysis in *Bourke*, which involved an analogous Kentucky anti-recognition law, to be especially persuasive with respect to the plaintiffs' likelihood of success on the merits of their Equal Protection Clause challenge in this case. There, the court analyzed the lineage of Supreme Court and Sixth Circuit precedent on the issue of marriage generally and same-sex marriage specifically, the animating principles in *Windsor*, and the relationship between discriminatory state marriage laws and the United States Constitution's guarantees, to which any state law is subordinate. *See* 996 F.Supp.2d at 546–57, 2014 WL 556729, at *3–12. Although that court strongly suspected that discrimination based on sexual orientation might warrant heightened scrutiny, it nevertheless subjected the anti-recognition law to a "rational basis" test under the Equal Protection Clause, found that none of the offered justifications satisfied rational basis review, and held that the anti-recognition law was unconstitutional. *Id.* In a final section, the court explained how its decision was consistent with constitutional values and requirements, was respectful of individual faith, was consistent with the public's desire to maintain the sanctity of marriage, fostered equality under the law, protected minority rights, and was the natural result of a long but steady progression in Supreme Court jurisprudence from *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) through *Windsor* in 2013. *Id.* at 553–57, 2014 WL 556729 at *9–12.

The anti-recognition laws at issue here and in other cases are substantially similar and are subject to the same constitutional framework. The defendants have not persuaded the court that Tennessee's Anti-Recognition Laws will likely suffer a different fate than the anti-recognition laws struck down and/or enjoined in *Bourke*, *Obergefell*, and *De Leon*.

Accordingly, the court finds that the plaintiffs are likely to succeed on the merits of their equal protection challenge, even under a "rational basis" standard of review. For this reason, the court need not address at this stage whether sexual orientation discrimination merits a heightened standard of constitutional review or whether the plaintiffs are likely to prevail on their additional due process and right to travel challenges.

## II. *Remaining Rule 65 Factors*

### A. Irreparable Harm

■ The loss of a constitutional right, "even for a minimal period[ ] of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Thus, "when reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir.2001).[11] Because the court has found

11. This rule has been applied in a variety of constitutional contexts, including equal protection challenges premised on same-sex discrimination. *See Bassett v. Snyder*, 951 F.Supp.2d 939 (E.D.Mich.2013) (enjoining Michigan law prohibiting public employers from providing medical and other fringe benefits to any person co-habitating with a public employee unless that person was legally married to the employee, was a legal dependent, or was otherwise ineligible to inherit under the state's intestacy laws); *Obergefell I*, 2013 WL 3814262, at *6 and *6 n. 1 (collecting cases); *De Leon*, 975 F.Supp.2d at 663–64, 2014 WL 715741, at *25; *see also Elrod*, 427 U.S. at 373, 96 S.Ct. 2673 (First Amendment); *Ramirez v. Webb*, 835 F.2d 1153, 1158 (6th Cir.1987) (Fourth Amendment); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981) (fundamental right to

that the plaintiffs are likely to prevail on their claims that the Anti–Recognition Laws are unconstitutional, it axiomatic that the continued enforcement of those laws will cause them to suffer irreparable harm.

Moreover, the evidence shows that the plaintiffs are suffering dignitary and practical harms that cannot be resolved through monetary relief. The state's refusal to recognize the plaintiffs' marriages de-legitimizes their relationships, degrades them in their interactions with the state, causes them to suffer public indignity, and invites public and private discrimination and stigmatization. For example, Sergeant DeKoe, who served nearly a year abroad in defense of the United States, is considered married while on military property in Memphis but unmarried off of it, which he understandably finds painful, demeaning, and diminishing. These are harms against which the Constitution protects. *See Windsor*, 133 S.Ct. at 2695–96.

Also, relative to opposite-sex couples, the plaintiffs are deprived of some state law protections, or at least the certainty that the same rights afforded to heterosexual marriages will be afforded to them. For example, they have no assurance that Tennessee will recognize their ownership of a home as tenants by the entirety, rather than as "strangers" with divisible interests. To the extent that plaintiffs could secure some of these rights by contract, they will be unfairly forced to engage in time-consuming and expensive measures to secure them, and even then only with respect to a subset of marriage rights.

For Dr. Jesty and Dr. Tanco, and for Mr. Espejo and Mr. Mansell, there is also an imminent risk of potential harm to their children during their developing years from the stigmatization and denigration of their family relationship. The circumstances of Dr. Jesty and Dr. Tanco are particularly compelling: their baby is due any day, and any complications or medical emergencies associated with the baby's birth—particularly one incapacitating Dr. Tanco—might require Dr. Jesty to make medical decisions for Dr. Tanco or their child. Furthermore, if Dr. Jesty were to die, it appears that her child would not be entitled to Social Security benefits as a surviving child. Finally, Dr. Tanco reasonably fears that Dr. Jesty will not be permitted to see the baby in the hospital if Dr. Tanco is otherwise unable to give consent.[12]

For all of these reasons, the court finds that the plaintiffs have shown that they will suffer irreparable harm from enforcement of the Anti–Recognition Laws. *See Obergefell I*, 2013 WL 3814262, at *6–7; *De Leon*, 975 F.Supp.2d at 662–64, 2014 WL 715741, at *24–25.

**B. Balance of the Equities**

 "[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir.2004); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir.2001). Here, because the

---

privacy under Fourteenth and/or Ninth Amendment) (cited approvingly in *Bonnell*, 241 F.3d at 809).

**12.** The state has taken the position that the plaintiffs' fears, including those of Dr. Tanco and Dr. Jesty with respect to the upcoming birth of their baby and their rights in their

home should one of them die, are "speculative," "conjectural," and "hypothetical." But the court need not wait, for instance, for Dr. Tanco to die in childbirth to conclude that she and her spouse are suffering or will suffer irreparable injury from enforcement of the Anti–Recognition Laws.

court has found that the Anti–Recognition Laws are likely to be found unconstitutional, the balance of the equities necessarily favors the plaintiffs. Tennessee has no valid interest in enforcing an unconstitutional policy. Furthermore, the administrative burden on Tennessee from preliminarily recognizing the marriages of the three couples in this case would be negligible. Therefore, the court finds that the balance of the equities favors issuance of a preliminary injunction.[13]

### C. Public Interest

The defendants argue that granting an injunction would "override by judicial fiat the results of Tennessee's valid democratic process establishing the public policy of this state," "cause harm to Tennessee in the form of an affront to its sovereignty," and "create the impression that Tennessee's public policy is subservient to that of other States." (Defs.' Mem. at pp. 25–26.) As the defendants point out, Tennessee overwhelmingly passed the constitutional amendment at issue with approximately 80% support in 2006.

Although the defendants are correct that issuing an injunction will temporarily stay the enforcement of democratically enacted laws, that is essentially the case with any federal decision that over-turns or stays enforcement of a state law that violates the federal Constitution. Ultimately, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.1994). Thus, "[t]he public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility Authority for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir.2012); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) ("[T]he public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional."); *Chabad*, 363 F.3d at 436 ("[T]he public interest is served by preventing the violation of constitutional rights."); *see also Obergefell I*, 2013 WL 3814262, at *7; *De Leon*, 975 F.Supp.2d at 664–66, 2014 WL 715741, at *26–27. Applying that principle here, the court finds that issuing an injunction would serve the public interest because the Anti–Recognition Laws are likely unconstitutional.

### III. *Summary*

In determining whether a preliminary injunction is warranted, the court's obligation is to balance the four Rule 65 factors. Here, all four factors favor the

---

**13.** At least two federal courts have similarly found that, where laws discriminating against same-sex marriages are likely to be found unconstitutional, the balance of the equities unequivocally favors the plaintiffs. As explained in *Obergefell I*:

No one beyond the plaintiffs themselves will be affected by such a limited order at all. Without an injunction, however, the harm to Plaintiffs is severe. Plaintiffs are not currently accorded the same dignity and recognition as similarly situated opposite-sex couples. Moreover, upon Mr. Arthur's death, Plaintiffs' legally valid marriage will be incorrectly recorded in Ohio as not exist-ing. Balanced against this severe and irreparable harm to Plaintiffs is the truth that there is no evidence in the record that the issuance of a preliminary injunction would cause substantial harm to the public.

2013 WL 3814262, at *7; *see also De Leon*, 975 F.Supp.2d at 663–65, 2014 WL 715741, at *25–26 (finding that injury to plaintiff outweighed damage to Texas from enjoining enforcement of same-sex marriage ban and anti-recognition law, and stating that "an individual's federal constitutional rights are not submitted to state vote and may not depend on the outcome of state legislation or a state constitution").

plaintiffs, and little balancing need be done. Therefore, the court will issue a preliminary injunction that bars enforcement of the Anti–Recognition Laws against the plaintiffs. The injunction will remain in force until the court renders judgment on the merits of the plaintiffs' claims at a later stage in this case. Again, the court emphasizes the narrow nature of its holding today: the court's order temporarily enjoins enforcement of the Anti–Recognition Laws only as to the six plaintiffs in this case. The court is not directly holding that Tennessee's Anti–Recognition Laws are necessarily unconstitutional or that Tennessee's ban on the consummation of same-sex marriages within Tennessee is unconstitutional.

At some point in the future, likely with the benefit of additional precedent from circuit courts and, perhaps, the Supreme Court, the court will be asked to make a final ruling on the plaintiffs' claims. At this point, all signs indicate that, in the eyes of the United States Constitution, the plaintiffs' marriages will be placed on an equal footing with those of heterosexual couples and that proscriptions against same-sex marriage will soon become a footnote in the annals of American history.

### CONCLUSION

For the reasons stated herein, the plaintiffs' Motion for Preliminary Injunction will be granted, and the court will issue an injunction against the defendants, prohibiting them from enforcing the Anti–Recognition Laws against the six plaintiffs in this case.

An appropriate order will enter.